**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 17-cv-1501-RM-SKC

Kimberly Aubrey,

    *Plaintiff*,

    *v.*

Carly Koppes, as Weld County Clerk and Recorder, and
Weld County Board of Commissioners,

    *Defendants.*

---

## ORDER

---

This action—by a former office technician against the county[1] that employed her—seeks damages for alleged disability discrimination, failure to provide reasonable accommodation, and retaliation in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, and Colorado Anti-Discrimination Act (CADA), Colo. Rev. Stat. Ann. § 24-34-401, *et seq.* Before the Court are (1) Defendant Weld County's motion for complete summary judgment (ECF Nos. 72, 73, 88) and (2) Plaintiff Kimberly Aubrey's cross-motion for partial summary judgment, which narrowly seeks a determination that she was "disabled" within the meaning of the ADA (ECF Nos. 74, 85). The parties have responded to the others' respective motions, and the matters are fully briefed. (ECF Nos. 72, 73, 74, 81, 84, 85, 88.) For the following reasons, the Court grants the County's motion.

---

[1] As an initial matter, the parties do not dispute that Defendants are duplicitous because "official capacity" claims are against governmental entities, not persons. There are no claims against Carly Koppes in her individual capacity. ECF No. 84, at 20; ECF No. 88, at 15. *See also Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.") (internal citation omitted). Therefore, the Court considers the claims to be only against Weld County.

# I.   BACKGROUND

The Weld County Clerk and Recorder's Office comprises three departments: Recording, Motor Vehicle, and Elections. (R-DSUMF ¶ 2.)[2] On June 21, 2012, the County hired Plaintiff Kimberly Aubrey as an Office Technician II in the Motor Vehicle Department. (DSUMF ¶ 1.) Shortly thereafter, the County promoted her to Office Technician III. (*Id.* ¶ 2.) On September 6, 2013, she transferred to the Recording Department. (*Id.* ¶ 3.) Among other things, an employee in that role

> [e]xamines and analyzes legal documentation submitted for land record recording. Assesses and collects all associated fees as required by law. Issues marriage licenses and civil union licenses and registers marriage and civil union certificates. Assists the public in person, by phone, through electronic media, and in writing regarding search procedures and requirements. Other duties may be assigned. . . . Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions. . . . The organization retains the right to modify or change the duties and responsibilities of the job at any time.

(R-DSUMF, Ex. 11.) As an employee, Aubrey was well-liked and considered hard-working by her superiors, including Defendant Carly Koppes. (*Id.* ¶¶ 8–9.) In 2014, Koppes, an Election Department head, ran for public office and could no longer oversee that department. To help fill the void, Aubrey temporarily transitioned to Elections and was to return to the Recording Department when the election concluded. (*Id.* ¶¶ 6–7.) Koppes won and became County Clerk and Recorder in January 2015. (*Id.* ¶ 1.)

---

[2]   "DSUMF" means "Defendants' Statement of Undisputed Material Facts," filed in support of their motion for summary judgment, as updated at ECF No. 89. "R-DSUMF" refers to Plaintiff's additional facts appended to DSUMF. "PSUMF" means "Plaintiff's Statement of Undisputed Material Facts," filed in support of her motion for partial summary judgment, as updated at ECF No. 85-1.

### A. Aubrey's Medical Condition and Time Away from Work

In late 2014, Aubrey developed a rare medical condition known as Posterior Reversible Encephalopathy Syndrome (PRES), a blood pressure regulatory problem that affects brain function, undermines cognitive ability, and can even cause coma and death. (DSUMF ¶¶ 6–8.) Aubrey experienced severe anxiety, tremors, seizures, and brain-swelling that caused a coma. (PSUMF ¶¶ 6, 10–11.) She also had severe limitation of her functional capacity. (*Id.* ¶ 12.) On December 8, 2014, because of her condition, Aubrey applied for work leave under the Family Medical Leave Act (FMLA), which was approved by the County's third-party FMLA claims administrator, FMLA Source. (DSUMF ¶¶ 4–6.) While she was away, the County sent Aubrey a letter explaining her rights to job-protected leave under the FMLA and Colorado Family Care Leave Act (CFCA) and notifying her that "[i]n order to be restored to your job, you must present to your employer certification from your doctor stating that you are fit to return to work." (*Id.* ¶¶ 64–65, Ex. T.) Aubrey's FMLA leave expired on February 22, 2015. (*Id.* ¶ 9.)

Both during and after her leave, Aubrey saw several medical professionals.[3] Dr. Angela Swayne at the Northern Colorado Long Term Acute Hospital admitted Aubrey and anticipated her return to work date would be August 1, 2015. (*Id.* ¶¶ 12–15.)

Dr. Mark Bernsten, who also treated Aubrey for her PRES, issued a FMLA leave of absence medical certification for her. (*Id.* ¶¶ 16–18.) On December 31, 2014, he related that Aubrey suffered from severe tremors, anxiety, and an inability to focus. (*Id.* ¶ 20.) At that time, he found that Aubrey would be unable to work until February 1, 2015. (*Id.* ¶ 21.) On March 9, 2015, Dr. Bernsten filled out an attending physicians statement, in which he opined that—based

---

[3] Other than those discussed below, DSUMF additionally provides facts from Dr. Ellen Burnham, with whom Aubrey does not recall ever being treated, and the document apparently authored by Dr. Burnham and cited by the County does not have Aubrey's name on it. (DSUMF ¶ 11.) Whether or not Aubrey's suggestion is enough to raise a dispute of fact, the Court skips over Dr. Burnham as her findings are largely duplicitous with those of the other medical professionals discussed here.

on her February 27 visit—Aubrey had a Class-5 physical impairment, meaning she was unable to perform any job task and not capable of taking care of herself. (*Id.* ¶¶ 22–27, Ex. L.) He recommended vocational counseling and rehabilitation and clarified that no job modifications or restrictions would permit her to work for the next four to six months. (*Id.* ¶¶ 28–29, Ex. L.)

Another treating physician, Dr. Revelyn Arrogante at the Northern Colorado Rehabilitation Hospital, explained that Aubrey's PRES caused cognitive issues (including with executive functioning, attention, and memory), balance issues, respiratory problems, a seizure disorder, peripheral vascular disease, depression, and visual deficits. (*Id.* ¶¶ 32–33.) On February 11, 2015, Dr. Arrogante recounted severe impairments with executive functioning and verbal reasoning and mild impairment with attention and memory—all of which impacted Aubrey's ability to work because she would be unable to sufficiently process any issues. (*Id.* ¶¶ 35–38.) On that date, Dr. Arrogante signed an FMLA leave of absence certification for FMLA Source indicating that hospitalization was medically necessary and that Aubrey was receiving 24-hour nursing care, as well as physical, occupational, speech, and respiratory therapies. (*Id.* ¶¶ 39–40.) In Dr. Arrogante's opinion at that time, Aubrey would not be able to return to work in any capacity until July 31, 2015. (*Id.* ¶¶ 41–45.)

Speech language pathologist Michelle Underhill also treated Aubrey at the Life Care Center of Greeley. (*Id.* ¶¶ 47–48.) On February 24, 2015, Underhill diagnosed Aubrey with a cognitive communication deficit and found that she was struggling with attending to and manipulating visual-spatial information; was severely deficient in communicating her thoughts, needs, and wishes; had difficulties with planning, organizing, and strategizing; and was unable to complete basic tasks. (*Id.* ¶¶ 54–56.) Even so, Underhill noted that Aubrey had sufficient vision, hearing, and alertness to participate in therapy; had demonstrated higher functional levels

compared to her current condition; was responding positively to therapy; and that Aubrey's age and self-motivation were strong indicators of improvement. (*Id.* ¶ 57.) As of April 1, 2015, according to Underhill, Aubrey was "unable to work pending resolution of cognitive-linguistic concerns." (*Id.* ¶¶ 53, 57.)

## B. Aubrey's Termination

During all this time, Aubrey stayed in contact with the County. On February 27, 2015, after her FMLA leave had expired, she called the County's benefits manager to say she had been released from the hospital, but—even though her condition was "reversible"—it would be months before she could return to work because of her memory problems and her inability to see well. (R-DSUMF ¶¶ 12–13.) While Aubrey was away, another employee, Michelle Wall, had been temporarily performing Aubrey's duties in the Recording Department. (*Id.* ¶ 11, Ex. 6.)[4]

Human Resources Director Patricia Russell testified that the County's typical process for medical accommodations makes a disabled employee responsible for filling out an ADA form, taking it to their physician with a copy of their job description, and having the medical professional return it so the County knows what accommodations can or cannot be made. (*Id.* at Ex. 4.) Depending on the situation, employees have about fifteen days to complete this task, but more time is given in certain circumstances if the employee requests it or it is in the County's best interest. (*Id.*; *see also id.* at ¶¶ 21–22 (Koppes agreeing that she sometimes extends the time per her discretion).) Though no one ever told her there was a deadline, the County had told Aubrey that she needed medical clearance to return to work. (*Id.* ¶ 17; DSUMF ¶¶ 64–65, Ex. T.)

Koppes was aware that Aubrey's FMLA leave expired had on February 22, 2015, and had permitted her leave to extend long beyond that date. (R-DSUMF ¶¶ 23–24.) But on April 15,

---

[4]    On June 19, 2015, two months after Aubrey's termination, Wall's position became permanent. Thirty days later, Wall would transfer out of Recording into the Planning Department. (R-DSUMF ¶ 11.)

2015, Koppes sent Aubrey a letter scheduling a pre-dismissal hearing for the next day. The letter

states:

> Dear Kimberly, You have been unable to report to work due to your current medical condition since December 8, 2014. Additionally, you have exhausted your 12 weeks of Family Medical Leave.
>
> The Office Technician III position is a vital position for the smooth operation and completion of our department's mandated responsibilities in order to fulfill the needs of the citizens of Weld County. It is essential that the Office Technician III position be filed on a full-time basis to perform the essential functions of that position.
>
> Since you are not able to perform the essential functions of your job as an Office Technician III and we are not able to accommodate your restrictions, a pre-dismissal hearing has been scheduled for you on Thursday, April 16, 2015 . . . . During this hearing, you have the right to present any updated information regarding your medical condition as it relates to your ability to perform the essential functions of the Office Technician position. If you have any medical updates from your doctor, please bring the information to the scheduled hearing. This hearing is your opportunity to present any relevant information which would have bearing on you employment status.

(DSUMF ¶ 58, Ex. I.) According to Aubrey, since she was slotted in the Recording Department

as of April 15, 2015, it was that position that Koppes was looking at to determine if there could

be an accommodation. (R-DSUMF ¶ 25.)

On April 16, 2015, Aubrey's hearing took place in front of Koppes and Russell. (DSUMF

¶ 59; R-DSUMF ¶ 3.) During the hearing, the participants delved into the reasons for possible

termination and whether Aubrey would be able to perform the essential functions of her position:

> KOPPES: And do you have any questions with the letter?
>
> AUBREY: No. I understand.
>
> KOPPES: And I want to make sure that you, a hundred percent, know it has nothing to do with your job performance at all. . . .

You've definitely been a standout employee for us. And so it's –
this is not that easy, either, for us.

…

AUBREY: So I guess I really do have questions. I mean, so does
this mean I am automatically dismissed?

RUSSELL: This is your opportunity to tell us why we shouldn't
dismiss you. Carly [Koppes] then has to go back and make the
decision if she should or should not. Contributing factor at this
point is could you come back to work within the next couple of
weeks to – you know, to do your full position.

AUBREY: Actually, if you ask me to, I could come back next
week. But I would not be able to do the things you asked me to. I
mean, I could not go back to Motor V[ehicles Department]. I
would probably have to be somewhat retrained. I am finally
remembering some of the things I did in [the Election
Department], you know. . . . I am still going to therapy. Not even
finished with that. I can't even get in to see an eye specialist,
which is a neuro ophthalmologist. . . . I feel confident yet that I
could do what I was. With a little bit of prompting and things like
that, yes. But I can't even drive yet. I have to see the neuro
ophthalmologist. I can't even do that until the 30th. Can't even get
a doctor's – I have to go to a neurologist, and the first time I can
get in is May 22nd. I mean, you can't just get these things done.
You don't know how hard I've tried. . . . It's been very frustrating.
I am able [to] do my own insurance stuff now. I can write my own
checks. I type. It's hard because of my vision, but it's all getting
better. And I'm very thankful for that, because I could be dead, and
I'm up and walking. . . . So I guess that's my rebuttal to all of this.
I've tried very hard.

. . .

KOPPES: [E]verybody that you've worked with has always said
that you are very much a team player and very much somebody
that everybody enjoys working with.

AUBREY: I mean, even if you guys would consider letting me
come back in a capacity, I would go down to an [Office]
Tech[nician] II. Just give me some time to get all my doctors in
order and say I can come back. Because I can't even get a doctor to
tell me, until I go to the neurologist, to say I can go back. It's the
22nd of May, you know.

. . .

RUSSELL: Okay. You've had a tough fight.

> AUBREY: Yep. Have a little more ways to go, and I'm just thankful to be where I'm at.
> . . .
> AUBREY: There's more. I mean, I've been to therapy here in Greeley. This is something I'm trying to make up for long-term disability. So – and I've typed it. So if there's errors. It took me forever, but that was a couple of weeks ago. I'm working hard on the computer. . . . I could even, at this point, in the Motor V[ehicles] [D]epart[ment], if somebody would check the titles, I'm sure I could enter them, you know. And they always have a backlog of entering titles.
>
> KOPPES: They've been working pretty hard.
>
> AUBREY: Yeah. So I do understand that. I know how hard it is for an office not to have a person there.
> . . .
> AUBREY: But they do say I probably – more than likely, it will never, ever happen again. It's just one of those things.
>
> RUSSELL: Well, we will – Carly [Koppes] will let you know probably tomorrow, one way or the other, what we're going to do.

(*See generally* DSUMF, Ex. J.) The balance of Aubrey's testimony makes clear that she believed she had been either meeting or exceeding rehabilitation and treatment expectations. (*See, e.g.*, *id.* at 6:5–8 ("I was supposed to be [at the hospital] the minimum six weeks. I was out in two.").) Additionally, Koppes understood Aubrey's intimations about being "somewhat retrained" and receiving "a little bit of prompting" to be requests for accommodations of her condition. (R-DSUMF ¶ 38.)

In considering if any accommodations could be made, Koppes testified that she

> look[ed] at every single job process in the Recording department. And, unfortunately, everything involved being on the computer and typing, and having good eyesight, and being able to understand over 200 different document types. There – there isn't a job in the Recording department that doesn't require you to be on the computer and be able to answer the phones and the public. There isn't any type of back-office jobs to do. It's all – all up front, dealing with the public and answering the phones and taking in recordings. . . . [E]verything is – is dealing with documents that are

> legal documents. And we have to make sure that they're indexed
> and verified properly, because it is a historical recording of
> property deeds, which is very important to have correct. . . .
>
> We were more looking at the lines of, is there any job that we
> could put her in. It was – it was more of can we find something for
> her to do or not. And, unfortunately, it wasn't – there just wasn't
> anything. From the information that she gave to Patti [Russell] and
> I at the predismissal hearing, trying to figure out if there was
> anything that we could do, we – we looked at everything. And it
> was more of the information that she gave us that we could not –
> unless we completely re-created a whole brand-new job and put a
> whole bunch of extra burden on her coworkers, we – there wasn't
> anything that we could do. It was more on what she said and the
> information that she gave us is what we had to go off of.

(*Id.* ¶ 29, Ex. 2.) On April 20, 2016, the County terminated Aubrey by letter from Koppes, who

is the relevant final decisionmaker. (DSUMF ¶ 60; R-DSUMF ¶ 47, Ex. 9.) The termination

letter stated in part:

> During the pre-dismissal hearing held yesterday, in the Human
> Resources Office, you indicated that you continue with ongoing
> active medical treatment for your health condition(s) and are
> unable to return to work until 07/31/2015. As you are unable to
> return to work and therefore unable to perform the duties of your
> job. I have no other choice than to dismiss you from employment
> with the Weld County Clerk & Recorder's Office effective
> immediately. . . .
>
> If your restrictions change and you are able to fulfill the essential
> functions of an Office Technician and a position becomes available
> in the future, feel free to apply at which time your application will
> be considered accordingly. If there are other positions available on
> the County's Employment Opportunities web page that you feel
> you may qualified to do at this time, contact Human Resources at
> [phone number].
>
> You may also be eligible for Short and/or Long Term disability
> benefits through Sun Life Assurance.

(R-DSUMF, Ex. 9.) Even though Aubrey later testified that—in order to return to work from a

continuous or reduced-schedule leave—she knew she needed a fitness-for-duty release from a

doctor, at no point prior to her termination did Aubrey provide any such communication from any medical professional. (DSUMF ¶ 65–66, Ex. E; R-DSUMF ¶ 18.)[5] She saw neurologist Dr. William Shaffer on May 22, 2015—as she indicated during the hearing—but Dr. Shaffer did not clear Aubrey to drive and did not provide her with a clearance to work, even though she requested one. (PSUMF, Ex. 3; DSUMF, Ex. EE.)

### C. Aubrey's Application for Disability Benefits and Ongoing PRES Difficulties

On April 20, 2015, the same day the County terminated her, Aubrey signed an application seeking long term disability benefits from Sun Life Assurance. (DSUMF ¶ 67.) On her application, she verified that she was "totally disabled"[6] because she could not perform her job responsibilities like before she had PRES. (*Id.* ¶¶ 68–71.) Aubrey testified that as of June 2015, she still had eye problems and could not drive. (*Id.* at Ex. E.). She further confirmed that, had she had been asked as of August 2015, she would have agreed that her memory issues still caused her too much stress to go back to her job. (*Id.*) By December 2015, Aubrey still considered herself to be "totally disabled" within the meaning of the benefits policy. (*Id.* ¶ 73.) Aubrey also applied for social security disability benefits, but she was denied the same on December 22, 2015. (*Id.* at Ex. X.)

Meanwhile, on June 4, 2015, Dr. Shaffer signed a letter stating that "Aubrey is currently under my medical care and may return to work as of 6/4/15. Brain [MRI] was normal. If you

---

[5]  Aubrey does not dispute that such a release was a prerequisite for her return to work. Instead, her response to DSUMF only points out that there is no established date by which such a release would have been required.

[6]  The Court understands the difference between the definitions of "disability" sufficient to show entitlement to long-term benefits and "disability" within the meaning of the ADA. Under the policy, "Total Disability or Totally Disabled means during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of [her] Own Occupation. After Total or Partial Disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if [s]he is unable to perform with reasonable continuity any Gainful Occupation for which [s]he is or becomes reasonably qualified/or by education, training or experience." (DSUMF, Ex. V.)

require additional information please call our office." (*Id.* at Ex. Z.)[7] After receiving that letter,

the County offered Aubrey a job as Office Technician III in the Motor Vehicle Department of the

Clerk and Recorder's Office, but she turned it down because—according to Aubrey—another of

her physicians would not clear her to work in that specific department since the stress levels

could aggravate her condition. (*Id.* ¶ 80; R-DSUMF ¶ 56.) The County admits that the Office

Technician III role in the Motor Vehicles Department requires more "heavy public contact" and

"pressure due to high public demand" than Office Technician III roles in either of the other two

departments in the Clerk and Recording Office. (R-DSUMF ¶¶ 43–44.)

## II.    SUMMARY JUDGMENT STANDARD

A party may move for summary judgment, identifying each claim or defense—or the part

of each claim or defense—on which summary judgment is sought. Fed. R. Civ. P. 56(a); *see also*

advisory committee's note to 2010 amendment ("[S]ummary judgment may be requested not

only as to an entire case but also as to a claim, defense, or part of a claim or defense."").

Summary judgment is only appropriate when there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law. *Hennagir v. Utah Dep't of Corr.*, 587

F.3d 1255, 1261 (10th Cir. 2009). When analyzing a motion for summary judgment, the court

must "view the evidence and draw all reasonable inferences therefrom in the light most favorable

to the party opposing summary judgment." *Mathews v. Denver Newspaper Agency LLP*, 649

F.3d 1199, 1204 (10th Cir. 2011). However, "the nonmoving party must present more than a

scintilla of evidence in favor of his position." *Ford v. Pryor*, 552 F.3d 1174, 1178 (10th Cir.

2008).  A fact is material if it has the potential to affect the outcome of a dispute under applicable

law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). A dispute is genuine only "if the

---

[7]    Dr. Shaffer also testified that as of July 6, 2015, Aubrey's major life activities—concentrating, interacting with
others, seeing, and thinking—were impaired as a result of PRES. (PSUMF, Ex. C.)

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011). Unsubstantiated allegations carry no probative weight in summary judgment proceedings. *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992). To defeat a motion for summary judgment, evidence, including testimony, "must be based on more than mere speculation, conjecture, or surmise." *See Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999); *Allen v. Muskogee*, 119 F.3d 837, 846 (10th Cir. 1997).

## III.   ANALYSIS

The ADA, CADA, and Rehabilitation Act prohibit covered employers from discriminating against otherwise qualified individuals with a disability. 42 U.S.C. § 12112(a); Colo. Rev. Stat. Ann. § 24-34-402; 29 U.S.C. § 794.[8] Claims relying on circumstantial evidence to allege disability discrimination or retaliation in violation of the these acts are subject to the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework:

> If a plaintiff establishes a prima facie case, the defendant "has the burden of coming forth with a legitimate, nondiscriminatory reason for adverse action." If the defendant can do so, the burden shifts back to the plaintiff to show that "the reason given by the employer is mere pretext for the real, discriminatory reason for the adverse action."

---

[8]   Violations of the Rehabilitation Act and CADA are analyzed under the same framework and authority as claims alleged under the ADA. *See* Colo. Rev. Stat. Ann. § 24-34-405(6) ("Except when federal law is silent on the issue, this section shall be construed, interpreted, and applied in a manner that is consistent with standards established through judicial interpretation of . . . the federal "Americans with Disabilities Act of 1990", as amended[.]"); 42 U.S.C.A. § 12201 ("Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title.").

*Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1265 (10th Cir. 2009) (quoting *Butler v. City of Prairie Village*, 172 F.3d 736, 752 (10th Cir. 1999); *see also Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (applying the burden-shifting analysis to a retaliation claim).

### A. Discrimination Claim

To establish a prima facie case of disability discrimination, a plaintiff must show: (1) she is disabled as defined by the ADA; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) she suffered discrimination on the basis of her disability. *Kellogg v. Energy Safety Servs. Inc.*, 544 F.3d 1121, 1124 (10th Cir. 2008). Each of these elements is essential to a discrimination claim, and the failure to show any one is fatal to a plaintiff's case. *Hennagir*, 587 F.3d at 1261–62

The first element is the subject of Aubrey's motion for partial summary judgment, in which she "seek[s] this Court's determination, as a matter of law, that Plaintiff is disabled as defined by the ADA[.]" (ECF No. 74, at 1.) Rebutting this proposition, the County walks a thin line. On one hand, "for purposes of [its own motion for] summary judgment only, [the County does] not contest Plaintiff had a disability at the time of her termination in satisfaction of the first element." (ECF No. 88, at 2.) And given both parties' thorough recounting of Aubrey's PRES, subsequent difficulties, and the assessments of Aubrey's doctors, the Court does not see a legitimate way for the County to dispute the facts on this element. But even as it cedes this point, the County asks the Court to deny Aubrey's motion, claiming that "a motion for entry of partial judgment on a single element is improper pursuant to Fed. R. Civ. P. 56 and applicable case law." (ECF No. 81, at 1.) The Court disagrees. As set forth above, the Federal Rules and comments on the 2010 amendment are clear that the summary judgment mechanism is available to resolve *parts* of claims and defenses. Fed. R. Civ. P. 56(a). The County dissents by citing

cases that pre-date the 2010 amendment and the advisory committee's revelation that "judgment may be requested not only as to an entire case but also as to a claim, defense, or *part of a claim or defense*." *Id.* at advisory committee's note to 2010 amendment (emphasis supplied). Pushing the outdated authority aside, the County rests on a magistrate judge's determination that relied on a District of Colorado case that also cited pre-2010 authority outside this jurisdiction. *See William Powers v. Emcon Assocs., Inc.*, No. 14-CV-03006-KMT, 2017 WL 4102752, at *1 (D. Colo. Sept. 14, 2017) (citing *Home Design Servs., Inc. v. Schroeder Const.*, No. 09-CV-01437-WJM-GJR, 2012 WL 527202, at *1 (D. Colo. Feb. 16, 2012) (citing *Capitol Records, Inc. v. Progress Record Distributing, Inc.*, 106 F.R.D. 25, 28 (N.D. Ill. 1985))). The modern rule made summary judgment a more versatile tool, and the Court declines to follow bygone legal principles. *See, e.g.*, *United States v. Pioneer Nat. Res. Co.*, 309 F. Supp. 3d 923, 925 (D. Colo. 2018). Thus, summary judgment would be an appropriate instrument to decide the narrow issue of Aubrey's disabled status at the time of her termination as a matter of law. There is no doubt Aubrey has met her obligations with respect to the first element, and the County does not contest any material fact on this issue.

The Court thus turns to whether Aubrey was qualified to perform the essential functions of her job with or without reasonable accommodation. This analysis "is not intended to second guess the employer or to require [it] to lower company standards. . . . Provided that any necessary job specification is job-related, uniformly enforced, and consistent with business necessity, the employer has a right to establish what a job is and what is required to perform it." *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009) (noting that the plaintiff bears the burden of establishing her capabilities). For purposes of this inquiry, "consideration shall be given to the employer's judgment as to what functions of a job are

essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see also Adair v. City of Muskogee*, 823 F.3d 1297, 1307 (10th Cir. 2016). The threshold question is whether a plaintiff has "the requisite skill, experience, education and other job-related requirements of the employment position." *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001) (quoting 29 C.F.R. § 1630.2(m)). Having made such a demonstration, a plaintiff then "bears the burden of showing that she is able to perform the essential functions of her job, with or without reasonable accommodation." *Hennagir*, 587 F.3d at 1262. "Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job *in the near future* and therefore whether the leave request is a 'reasonable' accommodation." *Winston v. Ross*, 725 F. App'x 659, 663–64 (10th Cir. 2018) (emphasis in original).

Here, an Office Technician III is responsible for examining and analyzing legal documentation; assessing and collecting fees; issuing marriage and civil union licenses; assisting the public on the phone, electronically, and in writing; and performing other duties as assigned. In reviewing the supplied job description, the Court is satisfied that Aubrey initially had the necessary skill, experience, and education for the job. She worked as an Office Technician III for several years in different departments, and the record is awash with high praise from her superiors regarding her pre-disability work. But with her disability, there are no facts which the Court could construe in Aubrey's favor that show her ability to perform the job's essential functions. First, Aubrey herself made clear through testimony, at her hearing, and on her disability benefits applications (even long after her termination) that she was incapable of doing the work without an accommodation. Despite these acknowledgements, Aubrey submits that on

June 4, 2015, a physician sent a letter to the County clearing her to work with no restrictions. But that same physician would not clear her on May 22, 2018—more than a month after her termination. It would not be reasonable for a jury to infer Aubrey's ability to perform the essential functions of her job at the time of her termination from a clearance provided two months later, provided by the same doctor that did not clear her more than a month after her dismissal.

So the question becomes whether Aubrey would have been able to perform with a reasonable accommodation. "Whether an accommodation is reasonable under the ADA is a mixed question of law and fact." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002). "The term 'reasonable accommodation' refers to those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job." *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996). Aubrey suggests that she proposed three potential accommodations during her April 16, 2015 pre-termination hearing: (1) an additional five weeks of leave to get an updated opinion from her neurologist, (2) retraining, or (3) a downgrade to an Office Technician II position.

For the first accommodation, the Tenth Circuit has found that "a request for indefinite leave cannot constitute 'reasonable' accommodation—such a leave request does not allow the employee to perform the essential functions of the job in the *near future.*" *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds*, *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001). It appears that Aubrey believes her request was definite because she knew she would be seeing her doctor on a date certain. But this is nothing more than a proposed date by which she would have had more information; it certainly didn't—as requested

by Aubrey—represent a definite end date by which her PRES (or management of it) would have been resolved. The Tenth Circuit requires an employee to provide an *expected duration of the impairment* (not the duration of the leave request). *See Hudson*, 87 F.3d at 1169 ("This court agrees with plaintiff that a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation. In this case, however, plaintiff has failed to present any evidence of the expected duration of her impairment as of the date of her termination."); *see also Brockman v. Wyoming Dep't of Family Servs.*, 342 F.3d 1159, 1168 (10th Cir. 2003) ("An employer is not required to wait indefinitely for an employee to recover.") (internal quotation omitted). Therefore, Aubrey's open-ended request for additional time to consult with a doctor was unreasonable as a matter of law.

With respect to retraining, the Court has no basis to evaluate the actual accommodation Aubrey requested. At the hearing, Aubrey intimated that she would "probably have to be somewhat retrained. I am finally remembering some of the things I did in [the] election [department], you know. I know I have to tab, and don't space or enter, you know." Aubrey cannot convert this passing suggestion into a request for a reasonable accommodation. From the information she provided, it appears that she was only just beginning to remember how to perform a single key-function task she once performed in a department other than the one to which she hoped to return. While retraining may be a reasonable accommodation under certain circumstances, the record reflects that Aubrey would be starting somewhere near square one. Aubrey has neither quantified the retraining she requested or shown how the same would be reasonable.

Finally, Aubrey has not shown how the downgrade to Office Technician II is a reasonable accommodation. There are no facts on the record that show that, as of her

termination, Aubrey was capable of performing any of the essential functions of that lower position, and she remained without a clearance from any doctor. As it stood, she was in a state of severe cognitive impairment, and the record does not show what the essential functions of the lesser position were, or how Aubrey would be more capable of performing those lesser functions. The Court is simply unable to evaluate the reasonableness of the downgrade—meaning Aubrey has failed to put forth facts that, even taken in the most favorable light, meet her burden of proof.

Because Aubrey fails to make out a prima facie case, the Court's analysis ends here, even though she has further done nothing to show as mere pretext the reasons for her termination supplied by the County—that because she was unable to come back to work, and therefore unable to perform the duties of her job, and because she agreed with the County's perception of her illness and admitted she had a ways to go before she would be able to work, there was no remaining choice but to dismiss her. *See, e.g.*, *Holly v. Kindred Healthcare Operating, Inc.*, 51 F. Supp. 3d 1113, 1122 (D. Utah 2014) ("[T]he employer's *perception of the facts* at the time of the decision to terminate controls[.]") (emphasis in original).

### B. Retaliation Claim

The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). In order to establish a prima facie case of retaliation under the ADA, the plaintiff must show: "(1) that she engaged in an activity protected by the statute; (2) that she was subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity; (3) that there was a causal connection between the protected activity and the adverse action." *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir.

2001). Retaliation claims are subject to the *McDonnell Douglas* burden shifting approach discussed above. *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004).

Here, Aubrey has sufficiently created factual disputes on the first two factors above. A request for accommodation is a protected activity, and a favorable reading of the hearing transcript shows that she made such requests on April 16, 2015. Moreover, her termination on April 20, 2015 followed those requests and is certainly an adverse employment action. On this second element, Aubrey goes one step further, suggesting that the County's failure to hire her after Wall left the Recording department constitutes adverse action. This supposition is unconvincing because there is no evidence that Aubrey ever applied for her old position once it opened or that the County rejected her and continued to seek other applicants. *See, e.g.*, *Cruces v. Utah State Veterans Nursing Home*, 222 F. App'x 776, 779 (10th Cir. 2007) ("In the failure-to-hire context, a plaintiff must show that she applied for and that she was qualified for a job for which the employer was seeking applicants and the employer continued to seek applicants after rejecting the plaintiff's application."). Thus the Court considers whether Aubrey has sufficiently alleged a causal connection between her request for accommodation and her termination.

On causation, there is no direct evidence that the County terminated Aubrey because of her requests, and Aubrey relies exclusively on the four-day temporal proximity between the events. The Tenth Circuit has indicated that the "date of Plaintiff's termination is key to this inquiry because the closer it occurred to the protected activity, the more likely it will support a showing of causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). But this principle, by which causation has been inferred by proximity alone, does not alter the over-arching requirement that there must be "genuine issues of material fact concerning [a] defendant's motivation." *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).

While her reliance on temporal proximity to make out a prima facie case is not entirely misguided, Aubrey has failed her duty, in the burden-shifting framework, to overcome the County's proffered legitimate reason for going through with the termination. After the hearing, Koppes testified that the County looked at every single job process in the Recording Department, attempting to find ways to accommodate Aubrey. Koppes concluded that there was no job available to someone who was "unable to return to work and therefore unable to perform the duties of [the] job." She also encouraged Aubrey to apply for a position that became available in the future if her restrictions were to change. Koppes also stated, and Aubrey agreed, that a department could not function adequately at less than capacity. The Court finds that the County has shown legitimate business reasons for termination, which Aubrey could have refuted by showing these reasons were mere "pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' [However, m]ere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). On this claim, Aubrey has not even suggested how the County's actions were pretextual. But borrowing from other portions of her brief, Aubrey believes the County's temporary accommodation of her absence by implanting Wall into her position demonstrates that the provided reasons for her termination were a mere pretext. But this fails because the County temporarily assigned Wall to Aubrey's position before the hearing, and therefore the two events cannot be causally related. Aubrey additionally provides other loosely formed hypotheses—none of which subvert the legitimate business

reasons provided by the County. Judgment for the County on Aubrey's retaliation claim is appropriate as a matter of law.

### C. Failure to Accommodate Claim

If an employer fails to satisfy its duty to accommodate, a disabled employee or job applicant may bring a failure-to-accommodate claim under the Rehabilitation Act. To state a failure-to-accommodate claim, Aubrey must allege that she: (1) is disabled; (2) is "otherwise qualified"; and (3) requested a plausibly reasonable accommodation. *Sanchez v. United States Dep't of Energy*, 870 F.3d 1185, 1195 (10th Cir. 2017); *see also Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010) ("Case law interpreting either act applies to failure-to-accommodate claims."). The Court permitted Aubrey to move forward with this claim because the required elemental showing is technically different than an ADA discrimination cause of action and the County did not cite authority precluding her from alleging failure-to-accommodate as a separate and distinct claim. But under the circumstances now, and with the benefit of the discovery record, the Court finds that Aubrey's failures on her first claim extend to this one because she cannot show that she presented the County any reasonable accommodation. Judgment is appropriate on this claim as a matter of law.

## IV.     CONCLUSION

For the foregoing reasons, the County's motion for summary judgment (ECF No. 72) is **GRANTED**; Aubrey's motion for partial summary judgment (ECF No. 74) is **DENIED** as moot; the County's motion for leave to conduct the deposition of Amy Hall in lieu of live testimony (ECF No. 93) is **DENIED** as moot; and Aubrey's objection to the magistrate judge's recommendation with respect thereto (ECF No. 98) is **OVERRULED** as moot. The Clerk shall enter judgment as set forth herein in favor of Carly Koppes and Weld County.

DATED this 17th day of April, 2019.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge